IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

DONNA MYERS,                    }
                                }
       Plaintiff               }
                                }        CIVIL ACTION NO.
       vs.                     }        05-AR-2002-S
                                }
PRISON HEALTH SERVICES, INC.,  }
                                }
       Defendant               }


## MEMORANDUM OPINION

Before the court is the motion of defendant Prison Health Services, Inc. ("PHS"), for summary judgment on the above-entitled action brought by plaintiff Donna Myers ("Myers"), under Title VII of the Civil Rights Act of 1964 for racial discrimination and for retaliation.  For the reasons that follow, the court will grant PHS's motion.

*Facts*

Some of the facts pertaining to PHS's motion for summary judgment are in dispute.  For purposes of this memorandum opinion, the court will recite the facts in the light most favorable to Myers, giving Myers the benefit of every doubt.

PHS is a private company which provides medical and healthcare services to inmates at 13 correctional facilities throughout Alabama.  Myers, a white female, began working for PHS at Donaldson Correctional Facility ("Donaldson") in Bessemer, Alabama, as a licensed practice nurse ("LPN") in November 2003.  Before that, Myers worked as an LPN at Donaldson but was employed by NaphCare,

Inc.  PHS assumed the Donaldson contract in November 2003, at which time Myers elected to switch employers in order to remain in her position as an LPN at Donaldson.

During her tenure at Donaldson, Myers received disciplinary counseling on at least six occasions.  The times relevant to PHS's summary-judgment motion occurred on June 1, July 7, and July 14, 2004.  On June 1 and July 7, 2004, PHS's director of Nurses for the State of Alabama, Jane Haynes ("Haynes"), verbally counseled Myers for wearing a stethoscope around her neck – a violation of PHS's safety policy.  Haynes, a white female, made a written record of these two counseling sessions on an "Employee Counseling Report" dated July 14, 2004.  The form of the Employee Counseling Report (herein, "counseling report") appears to be a standard form on which a PHS employee can document a subordinate employee's violation of a PHS policy.  On July 14, 2004, Haynes verbally counseled Myers for wearing excessive jewelry and for wearing excessively long fingernails, and documented this verbal reprimand on a counseling report.  PHS's written dress-code policy requires employees to wear minimal, conservative jewelry, and to keep their fingernails less than one-quarter inch long.  Myers does not deny that she violated the PHS dress code.  She contends, however, that various black employees violated the PHS dress code in the exact same manner as she did, but that none of the black employees were counseled or reprimanded for their violations.

2

In April 2004, PHS hired Stephanie Lawson ("Lawson"), a black female, to serve as the Unit Health Services Administrator ("HSA") at Donaldson.  As the HSA, Lawson had administrative responsibility for all PHS employees at Donaldson, and she had at least some authority to hire and fire employees.  Sometime in April or May 2004, Lawson told Dr. Clyde Varner ("Varner"), a black physician employed by PHS at Donaldson, that "she was going to get rid of all of them and bring in our people."  Myers interpreted that to mean that Lawson intended to fire the white employees and to replace them with blacks.  Myers did not actually hear Lawson make this statement to Varner, but she did hear Varner say that Lawson made it.  During Lawson's roughly one-year tenure at PHS, Lawson fired one white employee, suspended one white employee without pay, and hired ten black and four white employees.

At a meeting on June 1, 2004, Varner told various PHS employees that Lawson had told him she was going to get rid of all of "them" and bring in "our people."  Myers complained at the meeting that Lawson made this statement, and also complained that she thought Lawson wanted to fire white employees and hire black employees.  Immediately after the meeting, Haynes, who was also in attendance, approached Myers in the break area, grabbed the stethoscope that was hanging around Myers's neck, and tried to choke Myers.  This incident apparently occurred concurrently with, just before, or just after Haynes verbally reprimanded Myers for

wearing a stethoscope around her neck.

On November 18, 2004, Myers filed an EEOC charge alleging racial discrimination against PHS, citing the comment Lawson made to Varner. PHS thereafter investigated the facts Myers alleged in her EEOC charge. On March 9, 2005, after conducting its investigation, PHS filed a position statement with the EEOC, in which it denied that Lawson made the comment to Varner. PHS did not include with its position statement an affidavit from Lawson stating that Lawson did not make the comment. Lawson was fired from PHS approximately six days before PHS filed its position statement.

On or about July 14, 2004, Myers requested and was granted leave from PHS under the Family Medical Leave Act ("FMLA"). Myers took leave because she was under emotional stress from Haynes having reprimanded and tried to choke her in the break area. Myers did not return to Donaldson after she went on FMLA leave. On September 21, 2004, she tendered her resignation from PHS in a letter she sent to Kimberly Ashton at the PHS corporate office in Brentwood, Tennessee. In that letter, Myers wrote:

> Ms. Ashton:
>
> I am turning in my resignation as of 10-7-04 to Ms. Lawson at [Donaldson]. My doctors have already advised me that it will be several more weeks before I may be ready to return to work. My time on FMLA runs out 10-7-04 and I wanted to give notice.
>
> Thank you so much for your help.

Sincerely,

Donna Myers

*Summary Judgment Standard*

In considering a Rule 56 motion, the court must construe the evidence and make factual inferences in the light most favorable to the nonmoving party. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Adickes v. S.H. Kress & Co.*, 398 U.S. 144 (1970). The court may enter summary judgment only if it is shown "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). At this juncture, the court does not "weigh the evidence and determine the truth of the matter," but solely "determine[s] whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 242-43 (1986) (citations omitted). This determination involves applying substantive law to the substantive facts that have been developed. A dispute about a material fact is genuine if a reasonable jury could return a verdict for the nonmoving party, based on the applicable law in relation to the evidence developed. *See id.* at 248; *Barfield v. Brierton*, 883 F.2d 923, 933 (11th Cir. 1989).

*Analysis*

## I.   Title VII-Discrimination

Myers contends that PHS discriminated against her on the basis of her race. In order to demonstrate that she was the target of

5

racial discrimination due to disparate treatment in violation of Title VII, Myers must establish a *prima facie* showing of discriminatory intent. *See Hill v. Metro. Atlanta Transit Auth.*, 841 F.2d 1533 (11th Cir. 1988). Myers may establish a *prima facie* case in one of at least two ways: by providing direct evidence in the form of remarks or statements made by PHS or one of its agents, or by relying on circumstantial evidence of racial discrimination. *See id.* Myers attempts to establish her *prima facie* case using both alternatives.

## A. Direct Evidence

Myers says that Lawson's statement to Varner constitutes direct evidence of discrimination. Although Lawson's statement, and Varner's recitation of it, may be non-hearsay statements under Fed.R.Evid. 801(2)(D), this is not a direct-evidence case. Direct evidence of discrimination is "evidence which, if believed, proves the existence of the fact in issue **without inference or presumption**." *Taylor v. Runyon*, 175 F.3d 861, 867 (11th Cir. 1999) (citations omitted) (emphasis added). "Evidence that only suggests discrimination or that is subject to more than one interpretation does not constitute direct evidence." *Id.; see also Standard v. A.B.E.L. Servs., Inc.*, 161 F.3d 1318, 1330 (11th Cir. 1998) (finding that statements that require inference or presumption to be construed as discriminatory cannot constitute direct evidence, but can constitute circumstantial evidence).

6

If Myers had alleged that Lawson said she was going to get rid of all "white employees" and hire "blacks" or "non-whites," and if such statement could be attributed to PHS, then Myers might be able to use the statement as direct evidence.  In such a hypothetical scenario, no inference or presumption would be needed to understand what Lawson meant.  But in order to conclude that the actual statement Lawson made constituted proof of racial animus, a jury would have to infer or presume that Lawson meant "white employees" when she said "them," and that she meant "non-whites" or "blacks" when she said "our people."  That this inferential step is necessary means that the statement cannot constitute direct evidence.  The *Horne* case on which Myers relies to argue otherwise is inapposite, because in that case, there was no ambiguity as to whether the statements were discriminatory.  *See Horne v. Turner Construction Co.*, 136 Fed. Appx. 289 (June 21, 2005) (supervisor saying that he "disliked women on the job site" and that he would "fire [the plaintiff] because she is a woman" could serve as direct evidence of discrimination).  There are other problems associated with treating Lawson's comment as direct evidence of discrimination against Myers by PHS, such as that Lawson never "got rid" of Myers and that Lawson's comment cannot be attributed to PHS,[1] but the comment's inherent ambiguity is the most glaring among them.

## B. Circumstantial Evidence

---

[1] *See infra* at 18-20.

7

Although Myers cannot point to any direct evidence that PHS discriminated against her, she can establish a circumstantial *prima facie* case of racial discrimination in violation of Title VII by showing that (1) she belongs to a protected class; (2) she was subjected to adverse job action; (3) her employer treated similarly situated employees outside her classification more favorably; and (4) she was qualified to do the job. *See Rice-Lamar v. City of Ft. Lauderdale, Fla.*, 232 F.3d 836, 842-43 (11th Cir. 2000). PHS concedes for the purposes of its motion for summary judgment that Myers can meet elements (1) and (4). In order to prevail on its motion, PHS must therefore establish that there are no genuine issues of material fact with respect to the second or third elements of Myers's *prima facie* case.

PHS contends that Myers cannot demonstrate that PHS subjected her to an adverse job action to which a similarly situated, non-white employee was not subjected, and that it is therefore entitled to summary judgment. Myers counters that the following were adverse job actions that PHS took against her:[2]

- Lawson's statement to Varner that she was going to get rid of all of "them" and hire "our people" (Myers characterizes this statement as direct evidence of discrimination, but as

---

[2] Myers also accuses PHS, through the acts of Lawson and other PHS employees, of various other instances of bad behavior. The following points are the only alleged adverse employment actions Myers contends PHS ever took against **her**.

explained above, it can only constitute circumstantial evidence).

- Myers was counseled by Haynes for violating the PHS dress code by wearing excessive jewelry and wearing fingernails that exceeded 1/4 inch in length.[3]

- Myers was constructively discharged.

PHS denies that Lawson told Varner that she was going to get rid of all of "them" and bring in "our people," since neither Lawson nor Varner have testified that Lawson made this statement – the only evidence of it being Myers's saying that Varner said that Lawson made it.  Even assuming for purposes of PHS's summary-judgment motion that Lawson did make the statement and that it and Varner's recitation of it are non-hearsay, Lawson's statement could not have amounted to an "adverse employment action."  In order to constitute an adverse employment action, "an employee must show a **serious and material** change in the terms, conditions, or privileges of employment . . . as viewed by a reasonable person in the circumstances."  *Davis v. Town of Lake Park*, 245 F.3d 1232, 1239 (11th Cir. 2001) (emphasis in original).  Myers does not contend that she sustained any such "serious" or "material" change, such as termination of employment, docked pay, or loss of benefits or promotion opportunities, concurrently with or as a result of

---

[3] Myers was also counseled for at least four other violations of PHS policies, but Myers does not characterize these counseling sessions as manifestations of racial discrimination.

Lawson's statement.  *See id.* at 1243-1244.  Because, as a matter of law, Lawson's statement did not amount to an "adverse employment action," it cannot be used to establish Myers's circumstantial *prima facia* case of racial discrimination.

With respect to Haynes having counseled Myers for wearing excessive jewelry and excessively long fingernails, PHS does not deny that Haynes indeed reprimanded Myers for these dress-code violations.  Nor does PHS deny that there were black employees who also wore excessive jewelry and excessively long fingernails, but who were not similarly counseled or reprimanded because of it.  Instead, PHS points out that Haynes is a member of the same racial group as Myers, and further contends that several PHS employees – both black and white – counseled Myers at various times during her employment.  Unfortunately for PHS, none of these facts are relevant to whether Myers can establish a *prima facie* case of racial discrimination.

What is relevant is that PHS never suspended, docked the pay of, or fired Myers for violating PHS's dress code.[4]  Although proof of direct economic consequences is not required to prove an adverse employment action in all cases, "the asserted impact cannot be speculative and must at least have a tangible adverse effect on the plaintiff's employment."  *Davis*, 245 F.3d at 1239.  For example,

---

[4] Haynes's counseling Myers for violating the PHS dress code could not have amounted to a constructive discharge.  *See infra* at 13-14.

where an employer's allegedly unfounded criticism of an employee's job performance, in the form of job performance memoranda or otherwise, does not constitute a formal reprimand or trigger any tangible form of adverse action such as loss in benefits, ineligibility for promotional opportunities or more formal discipline, such criticism is rarely actionable under Title VII. *Id.* at 1242.  Here, Myers does not present evidence that can show that the counseling session with Haynes, or the accompanying counseling report, constituted an adverse employment action.  In the section of the counseling report labeled "Counseling Decision," Haynes wrote only that "[e]mployee will abide by employee dress code."  Importantly, the "counseling decision" was **not** to dock Myers's pay or benefits, to deem her ineligible for promotion, to change her job classification, or to sanction her in any way that would be consistent with a formal reprimand.  Myers therefore cannot establish a circumstantial *prima facie* case of discrimination by pointing to her having been counseled for violating the PHS dress code.

Finally, Myers says that she sustained an adverse employment action because she was constructively discharged.  In assessing her claim of constructive discharge, the court cannot consider Myers's subjective feelings about PHS's actions; rather, it must determine whether a reasonable person in Myers's position would consider the working conditions to be so intolerable that she would be compelled

to resign.  *See Steele v. Offshore Shipbuilding, Inc.*, 867 F.2d
1311, 1317 (11th Cir. 1989).  Myers contends that "the work
environment was so hostile and retaliatory that she was forced to
take medical leave and was subsequently unable to return to work."
Pla.'s Brief in Opp. To Def.'s Mot. For Summ. J. (herein, "Pla.'s
Opp.") (Doc. No. 29), at 45.  As to the conditions leading to the
resignation Myers says constituted a constructive discharge, she
says that she "was reprimanded in retaliation for engaging in a
protected activity and the [sic] Haynes, the State Director of
Nursing attempted to choke [her] after she complained in the June
1, 2004 meeting"; and that "it was apparent that [PHS] was in the
process of terminating [her] as a result of her complaints."  *Id.*
There is no evidence to support Myers's subjective belief that PHS
was in the process of firing her before she tendered her
resignation.  The court will therefore consider only Myers's
allegations of acts of retaliation that could have forced her
resignation.

Myers first points to her being reprimanded by Haynes for
engaging in statutorily protected activity, once on June 1, 2004
and again on July 14, 2004.  Regarding the June 1, 2004 incident,
in which Haynes counseled Myers for wearing a stethoscope around
her neck, Myers testified in her deposition:

> But I feel like that's – she was trying to make an
> example out of me by – this was after the meeting on June
> the 1st and I think she was just more throwing her weight
> around to say that because I'm white if I speak up I'll

be punished.

In the counseling report dated July 14, 2004 which memorialized the June 1, 2004 incident, Haynes's only substantive remarks were that:

> [o]n 6/08/04 [sic], you were advised by me that it was a safety risk for you to wear a stethoscope [sic] around your neck.  On 7/07/04, I noted again that you were wearing the stethoscope [sic] again and I verbally counseled you . . . . Employee will immediately stop the practice of wearing a stethoscope [sic] around her neck with the understanding voiced that this is a risk to her personal safety.

The second counseling incident that Myers says contributed to her constructive discharge happened on July 14, 2004.  As discussed above, Haynes counseled Myers on that date for wearing excessive jewelry and excessively long fingernails.  *See supra* at 9-11.

Neither the June 1, 2004 nor the July 14, 2004 reprimands, alone or together, can establish that Myers was constructively discharged.  From the face of the counseling reports, it appears that Myers was simply reprimanded for violating PHS's safety and dress-code policies.  But even if the court assumes that Haynes intended to harass Myers when she counseled her, this "harassment" could not rise to the level of severity or pervasiveness necessary for Myers's working conditions to be so intolerable that a reasonable person in her position would be compelled to resign.[5] *See Steele*, 867 F.2d at 1317.   The reprimands were neither

---

[5] Even so, Myers's **subjective** belief of Haynes's intent (what Myers "feels like" or "thinks," as she testified in her deposition) is irrelevant to the working conditions that would be perceived by an **objectively** reasonable person.  *See Steele*, 867 F.2d at 1317.

frequent, severe, nor physically threatening, and cannot establish that Myers was constructively discharged.

Nor can Myers sustain her Title VII discrimination claim by relying upon Haynes having attempted to choke her.  The details behind this incident are unclear, but if Haynes did in fact physically assault Myers, she undoubtedly did an extremely ill-advised thing.  Nevertheless, Title VII provides an avenue for redress for employees who are victims of unlawful **discrimination**, not physical assault.  Even if the court assumes that Haynes did attempt to choke Myers, that this act forced Myers to resign, and that Haynes's conduct can be attributed to PHS (a doubtful proposition), Myers does not offer any evidence or otherwise attempt to show that Haynes or PHS treated similarly situated employees outside her racial group less harshly.  For ought appearing, this was an isolated incident not representative of any PHS policy.  Myers does not attempt to show that any non-white employee in her position ever wore a stethoscope around her neck, and was not disciplined or assaulted as a result.[6]  Myers therefore cannot establish a *prima facie* case of racial discrimination under Title VII.  And even if she could, PHS would be able to point to a

---

[6] Myers did testify in her deposition that her supervisor, Joyce Romeo, was present when Haynes attempted to choke her, that Ms. Romeo was wearing a stethoscope around her neck at the time, and that Haynes did not attempt to choke Ms. Romeo.  However, Myers submits no further evidence to show that she and her supervisor were "similarly situated" or that Romeo is a member of a different racial group than Myers.

non-pretextual, non-discriminatory reason for the "disparate treatment." Indeed, Myers herself characterizes the attempted-choking incident not as an act of "discrimination," but rather as an act of retaliation against her for complaining about Lawson's comment to Varner. *See* Pla.'s Opp., at 41-45. "Retaliation" is not synonymous with "discrimination" for purposes of Title VII.

Because Myers cannot establish a circumstantial *prima facie* case that PHS discriminated against her because of her race, PHS's motion for summary judgment with respect to Myers's discrimination claim will be granted.

## II. Harassment and Hostile Work Environment

There is suggestion in Count One of Myers's complaint that she may have intended to claim the existence of a hostile-work-environment harassment, however inartful, in addition to her claim that she was disparately treated by PHS. *See* Pla.'s Compl. (Doc No. 1), at ¶ 13. To establish a claim for hostile-work-environment harassment under Title VII, Myers must show that: (1) she is a member of a protected group; (2) she was subject to unwelcome conduct; (3) the conduct was on the basis of race; (4) the conduct affected a term or condition of employment; and (5) imposition of liability on PHS is appropriate. *See Henson v. City of Dundee*, 682 F.2d 897, 903-05 (11th Cir. 1982).

To prove the fourth element of her *prima facie* case, Myers must establish that the alleged harassment was "sufficiently

15

pervasive so as to alter the terms and conditions of employment and create an abusive working environment." *Id.* at 904.  For the same reasons as those stated in Part I above, the harassment which Myers alleges to have occurred cannot meet this threshold level of pervasiveness **and** have been based on Myers's race.[7]  *See supra* at 11-14.  To the extent Myers intended to make a claim for hostile-work-environment harassment in violation of Title VII, that claim will be dismissed.

## III. Title VII-Retaliation

In Count Two of her complaint, Myers alleges that PHS retaliated against her for engaging in statutorily protected activity in violation of Title VII.  In order to establish a *prima facie* case of retaliation under Title VII, Myers must prove that (1) she participated in an activity protected by Title VII; (2) she suffered an adverse employment action; and (3) there is a causal connection between the participation in the protected activity and the adverse employment action.  *Gupta v. Florida Bd. of Regents*, 212 F.3d 571, 586 (11th Cir. 2000).

In order to establish the first element of her *prima facie*

---

[7] Haynes having attempted to choke Myers may have been sufficient to affect the terms or conditions of Myers's employment, but Myers says that Haynes did this because Myers complained about Lawson's comment to Varner, not because Myers is white.  Even if Myers had attempted to characterize the incident as race-based, however, the court has doubts as to whether one isolated incident can establish the level of pervasiveness necessary to establish a *prima facie* case of hostile-work-environment harassment in violation of Title VII.  The court also doubts whether such an isolated incident can be attributed to PHS.

case, Myers must show that she engaged in protected participation

or opposition within the scope of § 704(a) of Title VII.  *See*

*E.E.O.C. v. White & Son Enters.*, 881 F.2d 1006, 1012 (11th Cir.

1989).  That section provides:

> **It shall be an unlawful employment practice for an
> employer to discriminate against any of his employees** or
> applicants for employment, for an employment agency, or
> joint labor-management committee controlling
> apprenticeship or other training or retraining, including
> on-the-job training programs, to discriminate against any
> individual, or for a labor organization to discriminate
> against any member thereof or applicant for membership,
> **because he has opposed any practice made an unlawful
> employment practice by this subchapter,** or because he has
> made a charge, testified, assisted, or participated in
> any manner in an investigation, proceeding, or hearing
> under this subchapter.

42 U.S.C. § 2000e-3(a) (emphasis added).  Therefore, the employment

practice complained of by a Title VII-retaliation plaintiff must be

deemed unlawful under the terms of 42 U.S.C. § 2000e, or the

employee must at least have a good-faith belief that the employment

practice is unlawful.  *See* 881 F.2d at 1012, n.5.  42 U.S.C. §

2000e-2(a) states that "it shall be an unlawful employment practice

for an employer-"

> (1) to fail or refuse to hire or to discharge any
> individual, or otherwise to discriminate against any
> individual with respect to his compensation, terms,
> conditions, or privileges of employment, because of such
> individual's race, color, religion, sex, or national
> origin; or
>
> (2) to limit, segregate, or classify his employees or
> applicants for employment in any way which would deprive
> or tend to deprive any individual of employment
> opportunities or otherwise adversely affect his status as
> an employee, because of such individual's race, color,

17

religion, sex, or national origin.

Myers says that she engaged in statutorily protected activity when she "complained about Stephanie Lawson's **discriminatory comment** that she was going to get rid of 'them' and hire 'our people.'" Pla.'s Opp., at 4-5 (emphasis added); *see also id.,* at 41 ("Plaintiff complained about the **discriminatory statement** Lawson made . . . . Defendant reprimanded her in retaliation for complaining about **Lawson's statement.**") (emphasis added); *see generally* Pla.'s Compl.   In other words, Myers complained that Lawson made a remark, not that Lawson or PHS actually did get rid of "them" and replace them with "our people."   Nor could she have; Myers herself says that during Lawson's brief employment with PHS, Lawson hired both black and white employees.

Myers cannot establish that she participated in statutorily protected activity for two reasons.   First, Lawson's single comment cannot be attributed to PHS as something other than an isolated incident.   In order to hold an employer responsible under Title VII for the conduct of a supervisor or a co-worker, a plaintiff must show that the employer knew or should have known of the conduct and failed to take prompt remedial action.   *See Little v. United Techs.*, 103 F.3d 956, 959 (11th Cir. 1997).   Myers cannot make such showing.   PHS conducted an internal investigation of the matter after Myers filed her EEOC charge, and concluded that the incident did not occur.   Regardless of whether Lawson made the comment to

Varner, if PHS did not believe she made it after conducting an investigation in good faith, then PHS cannot be held vicariously liable for making it.   And even if PHS reached an erroneous finding, and the remark was, in fact, made, it would not prove a hostile work environment.

Second, even if the court assumes that Lawson meant "white employees" when she said "them" and "blacks" or "non-whites" when she said "our people," and if it also assumes that Lawson's comment can be attributed to PHS (which it cannot), notably absent from the list of unlawful employment practices proscribed by 42 U.S.C. § 2000e-2(a) is uttering a racially charged remark or even planning unsuccessfully to make personnel decisions based on people's races. And even if the court further assumes that Lawson's statement was intended to be more than mere posturing, the evidence is clear that Lawson never undertook to get rid of all the white employees at PHS and replace them with blacks.   Although Myers says that Lawson fired one white employee and suspended another, she concedes that Lawson hired four whites during her time at Donaldson.   Lawson's comment, while perhaps offensive and lacking in good taste, did not alter anyone's compensation, terms, conditions, or privileges of employment; and it did not by itself amount to an actual discharge or refusal to hire.   It simply did not meet the definition of a pervasive "unlawful employment practice."

Myers accurately states only half the law when she says that

an employee need only have a good-faith belief that her employer has engaged in unlawful discrimination in order to show that she participated in statutorily protected activity.  An employee's belief must not only be in good faith, but it also must be objectively reasonable in light of the facts and record presented. *See Little*, 103 F.3d at 960.  No reasonable jury could find that one isolated comment made by a supervisor amounts to unlawful discrimination on the part of the employer.  And even if it could, Myers points to no evidence, in the form of testimony, declarations, affidavits, or otherwise, to show that she held a good-faith belief that PHS engaged in unlawful discrimination.

Lawson's assumed comment to Varner cannot be attributed to PHS, and even if it could, Title VII does not treat ambiguous and ultimately empty comments as unlawful.  Myers's complaining about Lawson's remark was therefore not an opposition to an "unlawful employment practice" as required by § 704(a) of Title VII.

Although Myers cannot establish the first element of a *prima facie* case of retaliation in violation of Title VII, the court also points out that Myers did not suffer an adverse employment action because she can not meet the standards for proving a constructive discharge even if there is a causal connection between her complaining about Lawson's comment and any treatment she might not have liked.  Summary judgment on Myers's retaliation claim will be granted in favor of PHS.

*Conclusion*

For the foregoing reasons, PHS's motion for summary judgment will be granted.

DONE this 14th day of December, 2006.

_____
WILLIAM M. ACKER, JR.
UNITED STATES DISTRICT JUDGE

21